Filed 12/10/15  P. v. Garcia CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE ZAVALA GARCIA,<br><br>    Defendant and Appellant. | F068522<br><br>(Super. Ct. No. MCR046213)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Larenda R. Delaini, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Jose Zavala Garcia was convicted of spousal abuse and making a criminal threat.  After admitting having served two prior prison terms and having suffered

two prior strike convictions, defendant was sentenced to an aggregate term of 40 years to life.

On appeal, defendant asserts the following four arguments: (1) the trial court erred in declining to suspend proceedings and appoint an expert to evaluate his competency to stand trial; (2) there is insufficient evidence to prove defendant's threat was so immediate as to convey an immediate prospect of execution or to prove the threat caused the victim to be in sustained fear; (3) the trial court erred when it precluded the defense from impeaching the People's chief witness with recent misconduct involving embezzlement of funds from her employer; and (4) the trial court abused its discretion when it declined to dismiss one of defendant's prior strike convictions because the record establishes defendant's convictions for mayhem and carjacking arose from the same act: using force to steal the victim's car. We will remand the matter for resentencing but otherwise affirm the judgment of conviction.

## BRIEF FACTUAL AND PROCEDURAL SUMMARY

Defendant moved in with Pamela Repola at her duplex in Tucson, Arizona upon his release from prison; the two were married during his incarceration. A few months later however, in April 2013, the two left for Chowchilla, California to stay with defendant's family. Repola hoped this would make things better.

Although there were a few minor incidents in Arizona, the physical violence against Repola increased in Chowchilla. Both she and defendant were using drugs on a regular basis, money was tight, and neither was working.

On May 13, 2013, sheriff's deputies responded to the trailer where defendant and Repola were staying to investigate a reported domestic dispute. Her injuries included: a swollen and bruised left eye; an abrasion to her lip; and bruising on her right forearm, left upper arm and shoulder, collar bone, left hand and thumb. Ultimately, defendant was transported to a Madera hospital for a mental health evaluation, and Repola accepted a ride to the hospital from a deputy. The deputy suspected Repola's black eye was inflicted

2.

by defendant, but she told him it was the result of a fight with another woman. At trial, Repola admitted defendant did in fact inflict the various injuries, and that defendant beat her every day in Chowchilla.

After a long wait at the hospital, in the early morning hours of May 14, 2013, Repola was permitted to see defendant in his room. She asked him if he planned to change his behavior, but he replied negatively. Repola left defendant's room and returned to the waiting room where she tried to use the phone to find a ride. She had decided to return to Tucson. She was afraid of defendant and knew if she left with him something bad would happen.

Before Repola could figure out the phone, however, defendant approached her in the waiting room and wanted to leave. She told defendant she was not leaving with him; he responded by grabbing her hair, pulling her head back, and whispering, "I'm going to kill you bitch."

A nurse had observed defendant and Repola and asked Repola if she was okay. Repola said no, and followed the nurse out of the waiting room and into the emergency room department, away from defendant. After accepting a pamphlet regarding victim services and getting a few hours' sleep, Repola made contact with victim services and eventually made her way back to Tucson.

Defendant was charged with willfully and unlawfully inflicting corporal injury resulting in a traumatic condition upon his spouse (Pen. Code,[1] § 273.5, subd. (a)) and making a criminal threat (§ 422). Special allegations asserted prior serious or violent felony convictions and prior prison terms. Following a jury trial, defendant was found guilty on both counts. In a bifurcated proceeding, defendant admitted suffering serious felony convictions for mayhem (§ 203) and carjacking (§ 215, subd. (a)) in 2007.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

# DISCUSSION

## 1. Defendant's Competency

Defendant contends the trial court committed reversible error when it declined to suspend proceedings and appoint an expert to evaluate his competency to stand trial. We do not agree.

### The Relevant Proceedings

During the trial, defense counsel moved to dismiss the case against defendant, alleging the prosecution had violated its obligations pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 when it failed to provide the defense with a report concerning defendant's suicidal behavior on May 13, 2013. On that occasion, defendant climbed onto a roof, wrapped a cable around his neck, and threatened to jump and hang himself in response to the arrival of law enforcement officers following up on a report of domestic violence. As the parties argued the motion to the court, defense counsel stated "my client is—in my discussions with him—very articulate and seems to understand the process better than—better than most of my clients; however, he is not—he did not disclose to me any of the details regarding his—his suicidal behavior."

Ultimately, the court ruled as follows:

> "As to the [Welfare and Institutions Code section] 5150 issue, counsel knew that the defendant was there on a 5150. The defendant knew he was there on a 5150. I don't think that's material in light of that information. The fact that the defendant was up on the roof with some wires, that's probably the information that counsel did not have. Was not aware of. But the defendant was there, he could have provided him that information. I don't know why he didn't or did. But I'm not convinced that that's a material violation. But I do want to see additionally what's in the call for service report before I make a final decision. But tentatively I'm going to deny it."

Immediately thereafter, defense counsel stated:

> "[T]here's one other issue that the Court just mentioned—mentioned that does not—doesn't know why the defendant would not tell me. And throughout my—throughout my dealings with [defendant], he has—he has been basically bent on taking this matter to trial despite what appears to be

4.

quite over—overwhelming evidence against him. Um, I [have] been think[ing] about this pretty much all night. And based on—based on the fact that it appears that he attempted to commit suicide hours before—before he became a suspect in this case, and based on the fact that he has, you know, he rejected what I consider a very good offer and demanded to go to trial on a case that he's almost certain to lose, I believe at this time that [defendant] actually wants to be convicted. That he is continuing his suicidal efforts and is basically attempting to commit suicide by jury."

Counsel then declared "a doubt regarding the defendant's competence pursuant to [section] 1368." The court responded:

"THE COURT: All right. The Court's going to deny that request. [Defendant], as you indicated, is articulate. He understands the process better than most. And there's nothing that would indicate that he is not mentally competent at this time. So I'm going to deny the request. [¶] … [¶]

"… There is no evidence that he's suicidal Counsel. It hasn't been. He's very articulate. He's manipulative. He does the things that he wants to do. It appears to the Court in any event. And he's here and knows what's going on. He understands the proceedings. He's able to assist counsel in his defense. He's providing you—appears to the Court he's providing you with notes and comments regarding testimony, things to ask, et cetera. So the fact that somebody's suicidal does not relate to whether or not they are competent in that they understand that proceedings and they're able to assist in the defense. I'm going to deny the request."

Criminal competency proceedings are governed by sections 1367 and 1368. In those proceedings, "[a] defendant is mentally incompetent … if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) Once there is substantial evidence of the defendant's incompetence, the trial court must conduct a competency hearing. (*Id.*, at § 1368, subds. (b), (c); *People v. Rodriguez* (2014) 58 Cal.4th 587, 624; *People v. Mai* (2013) 57 Cal.4th 986, 1032.)

A defendant is presumed to be competent. (*People v. Ramos* (2004) 34 Cal.4th 494, 507; *People v. Hightower* (1996) 41 Cal.App.4th 1108, 1111.) To be entitled to a competency hearing, a defendant must exhibit more than bizarre or paranoid behavior,

strange speech, or a preexisting psychiatric condition with little bearing on the question of the defendant's ability to assist his or her counsel. (*People v. Ramos*, *supra*, at p. 508; see *People v. Lewis* (2008) 43 Cal.4th 415, 524, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919.)

Here, substantial evidence of incompetence does not exist on this record. To the contrary, defense counsel, very shortly before moving pursuant to section 1368, expressly asserted his client was "very articulate and seems to understand the process here better than—better than most of my clients …." Moreover, defendant's suicidal behavior, some four months prior to trial, did not speak to his then-present ability to understand the proceedings and to assist counsel in his defense.

Further, the court was able to observe defendant throughout the course of the proceedings. It noted the fact defendant demonstrated his understanding of the proceedings and was observed assisting counsel in his defense. Specifically, the court noted defendant was not suicidal, was "very articulate … manipulative …does the things that he wants to do … he's here and knows what's going on. He understands the proceedings." The court went on to note defendant was providing defense counsel "with notes and comments regarding testimony, things to ask, et cetera." The fact the trial court found no reason to doubt defendant's competency is to be accorded great deference by this court. (*People v. Kaplan* (2007) 149 Cal.App.4th 372, 383 [reviewing court generally gives great deference to trial court's decision whether to hold competency hearing].) And we find no reason to question the court's determination on this record.

Finally, while defendant's refusal to accept a beneficial plea offer could be termed as "bizarre," more is required than just bizarre actions to raise a doubt as to competency. (*People v. Danielson* (1992) 3 Cal.4th 691, 727, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Similarly, in defense counsel's terms, "being bent" on taking the matter to trial, without more, does not raise a doubt as

6.

to competency. (*Danielson*, *supra*, at p. 727; *People v. Ramos*, *supra*, 34 Cal.4th at p. 507.)

In sum, the trial court did not err in denying defense counsel's oral motion pursuant to section 1368.

**2.      Sufficiency of the Evidence**

Next, appellant complains his conviction for making a criminal threat must be reversed because there is insufficient evidence to prove his threat was immediate or that his victim was in sustained fear. Again, we do not agree.

In assessing a claim of insufficiency of the evidence, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. It is the jury that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

In reviewing a challenge to the sufficiency of the evidence, appellate courts do not determine the facts. We examine the record as a whole in the light most favorable to the judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) If the verdict is supported by substantial evidence, a reviewing court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

The testimony of a single witness—unless physically impossible or inherently improbable—is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

An appellate court must accept logical inferences the jury might have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429; see *People v. Conners* (2008) 168 Cal.App.4th 443, 453.)

> "The elements of the completed crime [of criminal threat] are: (1) The defendant willfully threatened to commit a crime that will result in death or great bodily injury to another person. (2) The defendant had the specific intent that the statement be taken as a threat. (3) The threat was on its face and under the circumstances '"so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat."' (4) The threat caused the victim '"to be in sustained fear for his or her own safety or for his or her immediate family's safety."' (5) The victim's fear was reasonable under the circumstances." (*People v. Jackson* (2009) 178 Cal.App.4th 590, 596.)

Here, there is sufficient evidence to prove defendant's threat was so immediate as to convey an immediate prospect of execution, and his threat caused Repola to be in sustained fear.

A threat is to be viewed under the surrounding circumstances under which it was made. (*People v. Butler* (2000) 85 Cal.App.4th 745, 753; *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218.) Repola testified that after she spoke with defendant in the hospital—wherein he flatly refused to stop assaulting her—she returned to the hospital's waiting room. She had decided to leave Chowchilla and return to Tucson; she tried using the pay phone in the waiting area, but was having difficulty. Before she could complete the call, defendant approached. He wanted them to leave the hospital together; Repola refused, telling defendant she was not going anywhere with him. In response, he pulled her hair and whispered in her ear, "I'm going to kill you bitch." At the same time, a

8.

nurse asked Repola if she was okay, and Repola said no. Asked if she wished to "go back in the back," Repola replied affirmatively and followed the nurse out of the waiting area and into the emergency room department. Defendant apparently left the hospital thereafter.

From the foregoing evidence, a jury could reasonably infer, particularly given defendant's willingness to assault Repola (pulling her hair) in an area that would permit his actions to be observed by hospital staff, that defendant was more than capable of taking immediate action against her and acting on his whispered threat to kill her. It is certainly a logical inference, and one we must, and do, accept. (*People v. Maury*, *supra*, 30 Cal.4th at p. 396; *People v. Kraft*, *supra*, 23 Cal.4th at p. 1053.)

As to Repola's sustained fear, the evidence is also sufficient. She testified that when defendant entered the waiting room and she advised him she did not wish to leave with him, he was angry. She was afraid of him and afraid for her life. In the public waiting room, defendant grabbed Repola by the hair and pulled her head in a backward motion. In a "very, very angry" voice, defendant told Repola he was going to kill her. She told defendant he was not going to kill her that day; she was thinking of the effect her passing might have on her mother and brother in light of another's brother's untimely passing. Repola testified she believed if she were to leave the hospital with defendant, "something bad" would have happened. Instead of leaving with defendant, and with the assistance of hospital staff, Repola remained in the emergency department of the hospital and was provided with a pamphlet for victim services assistance. She called victim services when it opened for business and made arrangements to return to Tucson via bus that same day. An employee of victim services drove her to the bus station. Additionally, Repola testified that after a week in Chowchilla she began to feel unsafe, and defendant had never threatened to kill her before the incident in the hospital waiting room.

From the foregoing evidence, a jury could reasonably infer Repola was in sustained fear following defendant's threat to kill her. This, too, is certainly a logical inference a jury would make and we accept it as such. (*People v. Maury*, *supra*, 30 Cal.4th at p. 396; *People v. Kraft*, *supra*, 23 Cal.4th at p. 1053.)

To conclude, the evidence is sufficient to support defendant's conviction for a violation of section 422.

## 3. Impeachment

Defendant maintains the trial court abused its discretion and violated his Sixth Amendment right to confrontation when it denied his request to impeach the victim's testimony with evidence she was suspected of embezzling from a prior employer in Arizona. We find no reversible error.

### A. The Proceedings Below

Below, defense counsel argued he should be permitted to impeach Repola with evidence she was alleged to have embezzled from her employer in Tucson, Arizona shortly before she and defendant moved to Chowchilla. He argued it went to her bias and credibility. The People opposed the proffered use of the evidence, contending it was not relevant. Repola was suspected of the crime of embezzlement. However, no charges had been filed, and, therefore, there was no conviction.

During an Evidence Code section 402 hearing on this issue, held once the court appointed counsel to Repola, she acknowledged being employed at the Cone Law Firm in Tucson. When she was asked whether she was authorized to use the firm's Office Depot credit card and whether she used that account to buy prepaid Visa cards, Repola invoked her Fifth Amendment rights to avoid self-incrimination.

After a discussion concerning the People's offer of immunity from prosecution, the trial court ruled as follows:

> "THE COURT: … I think I've heard all of the issues. I think at this point in time, the Court is going to preclude counsel from asking this witness about the alleged embezzlement. Not to go into that area

10.

whatsoever because she does have a right not to testify about it. So I'm going to preclude you from asking those questions she's exercised that right after advice with counsel.

"I think the alternative is to bring in witnesses from Arizona to testify regarding whether or not the embezzlement occurred and I think that would be an undue consumption of time basically we'd be trying two cases. So I think that the probative—the prejudicial value and the probative value in weighing that and undue consumption of time the Court's just not going to allow you to go into that. I think in this case that is not that—if we had a conviction, clearly it would come in but we don't even have the case charged at this point. And we would have to try the case in front of this jury to make a determination as to whether or not in fact she did commit the embezzlement. And I think that's just too time consuming. So I'm going to at this point preclude counsel from going in—either counsel from going into that area."

## B.    Our Analysis

Evidence Code section 788 authorizes admission of a prior felony conviction for "the purpose of attacking the credibility of a witness." A felony conviction is admissible under Evidence Code section 788 only if the felony involves "moral turpitude." (*People v. Castro* (1985) 38 Cal.3d 301, 317.) Also, prior misdemeanor conduct involving moral turpitude is admissible impeachment evidence. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295–296, superseded by statute on another point in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459–1460.) The belief is that "[m]isconduct involving moral turpitude may suggest a willingness to lie." (*Wheeler*, at p. 295.) Therefore, such evidence is routinely deemed relevant to credibility determinations, subject to a trial court's broad discretion under Evidence Code section 352. (*Wheeler*, at p. 296.)

In reviewing on appeal a trial court's decision to allow impeachment of a witness with a prior felony conviction involving moral turpitude, we apply the abuse of discretion standard. (*People v. Clark* (2011) 52 Cal.4th 856, 932.) The offense of embezzlement involves moral turpitude. (*In re Rothrock* (1944) 25 Cal.2d 588, 590.) Again, no charges had been filed against Repola at the time.

11.

Here, counsel for defendant moved for leave to impeach the victim with evidence she was suspected of embezzling from her prior employer by making prepaid Visa card purchases on the firm's Office Depot account and using them for her personal benefit.

Whether the trial court ruled incorrectly regarding the People's offer of immunity is not dispositive of the issue. For even assuming so, the trial court's ruling plainly concerned its determination pursuant to Evidence Code section 352.[2] And, more particularly, the fact that admission of this type of evidence would result in an undue consumption of time. "Rulings under Evidence Code section 352 come within the trial court's discretion and will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

Repola had neither been charged nor convicted of embezzling from her previous employer at the time of defendant's trial. (See *People v. Rogers* (2013) 57 Cal.4th 296, 331 [uncharged offenses are admissible only if they have substantial probative value].) As noted by the court, had Repola been convicted of embezzlement, the evidence would have been relevant and admissible: "[I]f we had a conviction, clearly it would come in …." Hence, the court's concerns regarding the time it would take to secure the testimony of out-of-state witnesses were paramount. It was concerned about "basically … trying two cases," a valid concern in the absence of a conviction or even charges. The probative value of evidence relative to Repola being suspected of embezzling from her prior employer is substantially outweighed by the probability that admission of that evidence would necessitate an undue consumption of time. The trial court's reasoning was not arbitrary or capricious, nor was it patently absurd.

---

[2]That section provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Even assuming error, any error was harmless under either the state or federal standard.[3]  Allowing the evidence of Repola's suspected embezzlement would not have definitively demonstrated she lied about defendant's physical abuse of her or his threat to kill her.  It might have demonstrated only that Repola was willing to steal from her employer in order to feed her drug habit and perhaps defendant's.  Yet Repola candidly testified about her drug and alcohol use during the relevant time period.  In closing arguments, defense counsel called Repola " a very forthcoming witness.  She told us the good.  She told us the bad.  She admitted to doing some things she probably didn't want to admit to."  He acknowledged Repola and defendant "were using drugs; drugs and alcohol on a regular basis."

Allowing the evidence of Repola's suspected embezzlement would have had little effect on defense counsel's arguments to the jury that Repola was not in sustained fear following defendant's purported threat, and on his arguments concerning the immediate prospect of carrying out a threat element.  Those were his key defenses and, in fact, defense counsel chose not to argue the spousal abuse count to the jury.  The jury clearly believed Repola's testimony that defendant had inflicted the various injuries to her body.  It is not likely the jury would have discredited Repola's testimony surrounding the circumstances of the threat had she been impeached with the suspected embezzlement evidence.

In sum, the trial court did not abuse its discretion in denying defense counsel's request to impeach Repola with the fact her previous employer suspected her of embezzlement.  And even assuming error occurred, it was harmless.

---

[3]*Chapman v. California* (1967) 386 U.S. 18, 24 (error is harmless if proven beyond a reasonable doubt that the error did not contribute to the verdict); *People v. Watson* (1956) 46 Cal.2d 818, 836 (error is harmful if it is reasonably probable a more favorable result would have been reached absent the error).

13.

**4. The Sentence Imposed**

Defendant contends the trial court erred in denying his request to strike one of the prior serious felony convictions because both prior serious felony convictions were based on a single act against a single victim. As explained below, we will reverse and remand the matter for defendant to renew his request for the court to dismiss his prior strike convictions.

**A. Relevant Legal Background**

At the time defendant was sentenced, the law concerning the circumstances then before the court included the decisions in *People v. Benson* (1998) 18 Cal.4th 24 and *People v. Burgos* (2004) 117 Cal.App.4th 1209.

In *Benson*, the defendant had two strike convictions arising out of the same set of facts: residential burglary and assault with intent to commit murder. (*People v. Benson*, *supra*, 18 Cal.4th at p. 26.) The trial court sentenced the defendant on the burglary, but stayed execution of the sentence on the assault pursuant to section 654. (*Benson*, at p. 26.) The facts underlying the strike convictions established the defendant committed multiple acts. After entering the victim's residence, ostensibly to retrieve some keys he had left there, he stabbed her 20 times. (*Id*. at p. 27.)

The high court in *Benson* held each conviction qualified as a separate strike under the three strikes law, notwithstanding the trial court stayed sentence on one of the felonies under section 654. (*People v. Benson*, *supra*, 18 Cal.4th at p. 26.) Rejecting defendant's contention on appeal that the result was harsh, the Supreme Court said that, in the absence of constitutional infirmity, it was not at liberty to alter the intended effect of the three strikes law on such grounds. (*Id*. at pp. 35-36.)

In a footnote, the *Benson* court said:

> "Because the proper exercise of a trial court's discretion under section 1385
> necessarily relates to the circumstances of a particular defendant's current
> and past criminal conduct, we need not and do not determine whether there
> are some circumstances in which two prior felony convictions are so
> closely connected—for example, when multiple convictions arise out of a

14.

> single act by the defendant as distinguished from multiple acts committed in an indivisible course of conduct—that a trial court would abuse its discretion under section 1385 if it failed to strike one of the priors." (*People v. Benson*, *supra*, 18 Cal.4th at p. 36, fn. 8.)

Thus, the court in *Benson* recognized the distinction between multiple convictions arising out of a single act and multiple convictions arising out of multiple acts during an indivisible course of conduct.

The appellate court in *Burgos* held the trial court abused its discretion in refusing to strike one of the defendant's two prior convictions in furtherance of justice under section 1385, because the two prior strike convictions—attempted carjacking (§ 215) and attempted robbery (§ 211)—arose from the same act, the attempted forcible taking of a vehicle, and also because section 215, subdivision (c), precludes sentencing for both offenses. As to the "same act" rationale, *Burgos* read the *Benson* footnote as "strongly indicat[ing] that where the two priors were so closely connected as to have arisen from a single act, it would necessarily constitute an abuse of discretion to refuse to strike one of the priors." (*People v. Burgos*, *supra*, 117 Cal.App.4th at p. 1215.)

After sentencing below and the completion of briefing in this court, the California Supreme Court held in *People v. Vargas* (2014) 59 Cal.4th 635, 640-649 (*Vargas*) that when a defendant has been convicted of committing a single criminal act on a single victim resulting in two felony convictions under different statutes, the trial court abuses its sentencing discretion if it fails to strike one of the two convictions. The *Vargas* court reasoned that when the offender commits but a single act, he or she does not pose a greater risk to society merely because the Legislature has chosen to criminalize the act in different ways. (*Id*. at p. 646.)

*Vargas* quoted from *People v. Carmony* (2004) 33 Cal.4th 367, 378, as follows:

> "'[b]ecause the circumstances must be "extraordinary … by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack" [citation], the circumstances where no reasonable people could

15.

disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary.' [Citation.]"

The court then stated:

"That a case would be extraordinary in which an offender with two prior qualifying convictions would fall outside the spirit of the Three Strikes law does not mean such cases do not exist. We must decide whether defendant's case falls into this rare category, that is, where the facts—here, that defendant's two strikes were based on the same act—demonstrate that no reasonable person would disagree that defendant fell outside the spirit of the Three Strikes law…." (*Vargas*, *supra*, 59 Cal.4th at pp. 641–642.)

In *Vargas*, the defendant had two prior strike convictions for robbery and carjacking, which "were based on the same act of taking the victim's car by force …." (*Vargas*, *supra*, 59 Cal.4th at pp. 640, 645.) *Vargas* held the trial court was required to dismiss one of the prior convictions (*id*. at p. 639), explaining that treating such a defendant as a third strike offender "was inconsistent with the intent underlying both the legislative and initiative versions of the Three Strikes law. [Citation.]" (*Id*. at p. 645.) The defendant's prior strikes "were not only tried in the same proceeding and committed during the same course of criminal conduct, they were based on the same act, committed at the same time, against the same victim." (*Id*. at p. 638.) The court explained "the voting public would reasonably have understood the 'Three Strikes' baseball metaphor to mean that a person would have three chances—three swings of the bat, if you will— before the harshest penalty could be imposed. The public also would have understood that no one can be called for two strikes on just one swing. Permitting the trial court below to treat defendant's 1999 robbery and carjacking convictions as separate strikes— despite the fact they were based on a single criminal act—would do just that, and thus contravene the voter's clear understanding of how the Three Strikes law was intended to work." (*Id*. at p. 646.)

We are bound by the decisions of our Supreme Court. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) And considering the high court's holding

and reasoning in *Vargas*, for the reasons that follow, we conclude the sentence must be vacated and the matter remanded for resentencing.

**B.     The Proceedings Below**

At sentencing, defense counsel contended pursuant to the "*Benson-Burgos* rule" the court should strike one of defendant's two priors because his convictions arose from one discrete act.  On the other hand, the People argued those same prior convictions arose from separate and distinct acts, making *Burgos* inapplicable.  Following consideration of the parties' arguments, the trial court, relying on probation and police reports, ruled as follows:

> "THE COURT:  All right.  Well, the Court went through the Probation report.  Let me outline for you your information that I gleaned from it, and then we may have a further discussion about it.

> "Page 4, line 7 through 9, it's indicated that there was a witness who was in the area, and that the victim went up to that witness and told them one, my husband hit me.  Two, he threw me out the car.  And three, he took my car.  That's page 4, lines 7 through 9.  So it appears there are separate acts.  The hitting and then the force us[ed] to take her out of the car.

> "Additionally, we have testimony—I'm sorry—we have information out of the Probation report that says page 5, lines 27 through 28, gives you some sense of what the Court, at the time, I believe it was Judge Detjen, is quoted as saying, the Court advises the defendant that both counts in this case will be considered strikes.  And any future prosecution will expose him to a prison sentence of 25 years to life.  Indicating the Court, at least at that time, felt that they were separate instances.

> "On page 5, line 5 in the analysis, it says, 'The crimes in each case and their objectives were predominantly independent of each other.'  It does not appear anyone argued against that or indicated that that was not correct.  And the issue is whether we have a single act that resulted in multiple crimes or multiple acts, and a course of conduct that resulted in multiple crimes.

> "So we have—according to the report—defendant strikes victim with a beer can, causing the mayhem or the disfigurement.  He then forcibly takes victim out of the car and then he takes the car.  [¶] … [¶]

17.

"… So the question is whether or not this was an incident where he smashed her in the face, because that's what he does with people who love him. Or, this is an incident where he wanted the car and he smashed her in the face so that he could get the car away from her. And based upon the information contained in the police report, it does appear to be separate acts. He was getting angry. He was talking about younger women, et cetera. No, nothing whatsoever about the vehicle when he smacks her in the face with a can or with something that caused the disfigurement. So that's one act.

"And then she tells the person in the neighborhood right after it happened, he then threw her out of the car. Well, that is a separate act, and that is force, and that does support the conviction of the carjacking. So again, I think we have one [course] of conduct with multiple acts resulting in multiple offenses.

"That information alone contained in the report that the Court has gone over, I think does establish that there were multiple—multiple acts. [¶] … [¶]

"… And on that basis, the Court's going to deny the motion, the Romero motion."

## C.    Our Analysis

The trial court's reliance on hearsay contained in probation and police reports to make its factual finding there were separate acts supporting the prior strike convictions was plain error that requires a remand for resentencing. (See *People v. Trujillo* (2006) 40 Cal.4th 165, 179 [probation reports]; *Draeger v. Reed* (1999) 69 Cal.App.4th 1511, 1521 [police reports].) Below we set forth the guiding principles the trial court must apply at the resentencing hearing in determining whether defendant committed separate acts or only one act that resulted in two prior strike convictions. Of course, the sentencing court is not precluded from granting a motion made pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 even if it appropriately finds separate acts supported the convictions. However, under *Vargas*, the sentencing court abuses its discretion to deny the *Romero* motion if it finds both convictions arose from a single act of force.

"Determining whether a prior conviction qualifies as a strike under the Three Strikes law is … the type of inquiry that judges traditionally perform as part of the

18.

sentencing function. Often this determination is purely legal, with no factual content whatever." (*People v. Kelii* (1999) 21 Cal.4th 452, 456.) "Sometimes the determination does have a factual content, just as the question whether convictions were brought and tried separately has a factual content." (*Ibid.*) "But these factual questions are of limited scope," and the court's determination in such situations is guided by *People v. Guerrero* (1988) 44 Cal.3d 343. (*People v. Kelii*, *supra*, at p. 456.)

The court in *Guerrero* held that "in determining the truth of a prior-conviction allegation, the trier of fact may look to the entire record of the conviction." (*People v. Guerrero, supra,* 44 Cal.3d at p. 355.)

> "Such a rule is both fair and reasonable. To allow the trier of fact to look to the entire record of the conviction is certainly reasonable: it promotes the efficient administration of justice and, specifically, furthers the evident intent of the people in establishing an enhancement for 'burglary of a residence'—a term that refers to *conduct,* not a specific *crime.* To allow the trier to look to the record of the conviction—*but no further*—is also fair: it effectively bars the prosecution from relitigating the circumstances of a crime committed years ago and thereby threatening the defendant with harm akin to double jeopardy and denial of speedy trial." (*Id*. at p. 355.)

The "record of conviction" includes charging documents, the information, minute orders, the preliminary hearing transcript (in the absence of a trial), the trial transcript, a reporter's transcript, change of plea form, the court records of the defendant's admission or plea, and the appellate record, including the appellate opinion, for the prior conviction. (*People v. Reed* (1996) 13 Cal.4th 217, 223–224; *People v. Woodell* (1988) 17 Cal.4th 448, 456; *People v. Bartow* (1996) 46 Cal.App.4th 1573, 1579–1580; *People v. Abarca* (1991) 233 Cal.App.3d 1347, 1350; *People v. Harrell* (1989) 207 Cal.App.3d 1439, 1443–1444.) It does not include police reports. (*Draeger v. Reed*, *supra*, 69 Cal.App.4th at p. 1521.)[4]

---

[4]Even when evidence is part of the "record of conviction," its admission must still comport with the rules of evidence, particularly the hearsay rule. (See *People v. Woodell*, *supra*, 17 Cal.4th at pp. 457–460; *People v. Reed*, *supra*, 13 Cal.4th at pp. 224–228, 230–231.)

The California Supreme Court has held multiple hearsay and "[n]arration of 'reported' events" in a probation report are inadmissible as part of the record of conviction. (*People v. Reed*, *supra*, 13 Cal.4th at p. 230.) In *People v. Trujillo*, *supra*, 40 Cal.4th 165, the court held a defendant's statements, "made after a defendant's plea of guilty has been accepted, that appear in a probation officer's report prepared after the guilty plea has been accepted are not part of the record of the prior conviction, because such statements do not 'reflect[] the facts of the offense for which the defendant was convicted.' [Citation.]" (*Id.* at p. 179.)**5**

Importantly, the California Supreme Court has also held testimony from live witnesses obtained in a subsequent proceeding is not part of the "record of conviction." In *People v. Reed*, the court held a preliminary hearing transcript for the defendant's prior convictions was part of the record of conviction, and the multiple hearsay within that transcript was admissible under the former testimony exception to the hearsay rule. In doing so, *Reed* explained that even if witnesses who had testified at the prior preliminary hearing were available to testify at a subsequent proceeding in another case, those witnesses "were *legally* unavailable because, under the rule announced in *People v. Guerrero*, *supra*, 44 Cal.3d 343, the prosecution was precluded from presenting any evidence *outside the record of conviction* to prove the circumstances of the prior crime." (*People v. Reed*, *supra*, 13 Cal.4th at p. 225.)

> "By holding in *Guerrero* that the trier of fact may look to the entire record of conviction '*but no further*' (*People v. Guerrero*, *supra*, 44 Cal.3d at p. 355), we precluded the prosecution from calling live witnesses to the criminal acts in the prior case. The People 'may not relitigate the facts behind the record.' (*People v. Johnson* (1992) 3 Cal.4th 1183, 1242.) As one Court of Appeal summarized the rule, 'the prosecution is not permitted to relitigate the circumstances of a past offense by introducing evidence outside the record.' (*People v. Smith* (1988) 206 Cal.App.3d 340, 344,

---

**5**At the sentencing hearing, defense counsel said he was not sure if there had been a preliminary hearing in the 2007 case. Defendant interrupted and said yes. There is evidence in the instant appellate record that when defendant entered his pleas in the 2007 case, he stipulated that the preliminary hearing transcript was the factual basis for those pleas.

20.

fn. 6.) Live testimony from [the preliminary hearing witnesses] would have been evidence outside the record, used to relitigate the circumstances of the prior offense. Under *Guerrero*, the prosecution was absolutely barred from presenting such evidence. The witnesses' *live* testimony was thus unavailable as a matter of law." (*People v. Reed, supra*, 13 Cal.4th at p. 226; accord, *People v. Kelii, supra,* 21 Cal.4th at pp. 456–457 [under *Guerrero* and *Reed*, "no witnesses testify about the facts of the prior crimes"; "[t]he trier of fact considers only court documents" and sometimes "must draw inferences from transcripts of testimony or other parts of the prior conviction record"].)

The court also rejected defendant Reed's assertion the *Guerrero* rule was adopted to benefit the defense and should not be used against him to preclude confrontation of witnesses. "Defendant, however, did not seek in this case to have the witnesses produced or to cross-examine them anew; he only objected on hearsay grounds to admission of their prior testimony. We express no opinion as to whether a defendant would be entitled to call live witnesses to dispute circumstances of the prior offense .…" (*People v. Reed, supra*, 13 Cal.4th at p. 229.)

In *People v. Bartow*, *supra*, 46 Cal.App.4th 1573, the court expanded on *Reed* and held "live witnesses may not be called by either side," and *Guerrero* barred the defense from introducing newly obtained testimony as part of the "record of conviction." (*People v. Bartow*, *supra*, at pp. 1581–1582.) "By emphasizing that the trial court could go '*no further*' than the record, *Guerrero* forecloses the calling of live witnesses—by either prosecution or defense. The court did not limit this condition to the prosecution, although it did justify the reasonableness of the rule by stressing its consequent protections for the defendant. We see no rational basis for adopting a different rule for the defendant .…" (*Id*. at p. 1581.)[6]

---

[6]In *Gill v. Ayers* (9th Cir. 2003) 342 F.3d 911, 919–920, the Ninth Circuit Court of Appeals disagreed with *Reed* and *Bartow* to the extent that a defendant has the due process right to testify at a sentencing hearing about the underlying facts of his or her prior convictions to determine if the offenses were strikes.

In this case, while the victim testified at defendant's trial, the foregoing authorities preclude the trial court from relying on this testimony to make its factual determination because the testimony is not part of the record of conviction.

## DISPOSITION

The sentence is ordered vacated and the matter is remanded for defendant to renew his request for the court to exercise discretion to dismiss his prior strike convictions pursuant to section 1385, *People v. Superior Court* (*Romero*), *supra*, 13 Cal.4th 497, and *Vargas*, *supra*, 59 Cal.4th 635.  In all other respects, the judgment is affirmed.


_____
PEÑA, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
SMITH, J.